## Scottsdale Insurance Company v. Grim

C.P. of Monroe County, no. 360 Civil 1995.

*William K. Conkin,* for Scottsdale Insurance Co.
*Howard Krug,* for June Grim.
*Eugene D. Sperazza,* for James Taylor, Pocono Neurology Assoc.
*Anthony Piazza Jr.,* for Fay's Drugs.

*Jeffrey G. Velander,* for Dr. Snayam Mahajan.

*Kathleen Quinn Depillis,* for James Taylor, Ind.

*James Wilson,* for G. Gupta M.D.

*Salvatore P.J. Vito,* for Louis Bruno, Joan Fry, No Problem Management.

*Richard T. Curley,* for Pocono Intermediate Care Center.

WALLACH MILLER, *J.,* November 8, 1999—

## FINDINGS OF FACT

(1) RBL of Pennsylvania is the local insurance brokerage firm involved in obtaining the insurance coverage at issue in this case through Scottsdale Insurance Company.

(2) Thomas Geffers is an independent contractor of RBL, who was directly involved with securing the information necessary to complete the commercial insurance application required to obtain liability and umbrella insurance through Scottsdale. (Plaintiff's exhibit no. 8.)

(3) RBL and Geffers were also involved in assisting Louis Bruno's financing of the above insurance through Imperial Premium Finance Inc.

(4) Geffers obtained the majority of the information contained on the commercial insurance application through discussions held from April 1992 through June 1992 with Louis Bruno, president of No Problem Management Co. Ltd., as well as with Dr. Shyam Mahajan, who was a partner of Chaitanya Associates; and agent of

Peoples Personal Care Medical & Rehabilitation Center and the future medical director of peoples.

(5) Bruno represented to Geffers that No Problem was to be the primary insured and that Peoples, Chaitanya and the medical director were to be additional insureds or riders on the various policies.

(6) During the period when the information was being provided by Bruno and Mahajan, there was no formal written agreement between No Problem and Peoples regarding authorization for No Problem to negotiate or obtain any type of insurance on behalf of Peoples.

(7) Eventually, a management agreement dated July 25, 1992 was created, but the management agreement was not signed by Sarvesh Mahajan, the son of Dr. Mahajan and alleged president of Peoples, until November 28, 1992, or by Louis Bruno, the president of No Problem, until December 11, 1992.

(8) Peoples was not incorporated until November 30, 1992.

(9) No Problem and Peoples are two distinct business entities and have separate corporate officers.

(10) After the commercial insurance application was submitted, Scottsdale issued two insurance policies, a general liability policy, GLS 466888, and an umbrella liability policy, UMB 025971. (Plaintiff's exhibits no. 2 & no. 3.)

(11) On the declaration pages of both Scottsdale policies, the named insured was identified as Peoples Personal Care Medical & Rehabilitation Center, located at

51 North Second Street, Stroudsburg, PA 18360. No Problem Management Co. Ltd., Chatanya Ltd. [sic], and the medical director were identified as additional insureds on both policies. (Plaintiff's exhibits no. 2 & no. 3.)

(12) Concurrently with the issuance of the Scottsdale policies, RBL and Geffers also obtained automobile insurance coverage for the insureds through a separate policy with Travelers Insurance Company, TCMB 201T142892.

(13) On the commercial premium finance agreement with Imperial, the borrowers were identified as Peoples Personal Care Medical & Rehabilitation Center and/or No Problem Management Co. Ltd., with an address of 51 N. Second Street, Stroudsburg, PA 18301. (Plaintiff's exhibit no. 11.)

(14) In accordance with the commercial premium finance agreement, the borrowers identified on the front of the document irrevocably appointed Imperial as the borrowers' attorney-in-fact, with authority to cancel any insurance policy identified on the front page for non-payment. (Plaintiff's exhibit no. 11, p. 2.)

(15) The commercial premium finance agreement identifies three specific insurance policies financed by Imperial. Travelers Insurance Company issued one policy and the two remaining policies were issued by Scottsdale Insurance Company. (Plaintiff's exhibit no. 11, p. 1.)

(16) The additional insureds, Chaitanya and the medical director were not identified as borrowers on the commercial premium finance agreement and never gave Im-

perial a power of attorney to cancel the Scottsdale policies on their behalf. (Plaintiff's exhibit no. 11, p. 1.)

(17) Under the commercial insurance application completed by Geffers, Chaitanya was required to be issued a certificate of insurance to insure that Chaitanya's interest as an additional insured/third party would be protected, in the event of cancellation or lapse of coverage. (Plaintiff's exhibit no. 8, p. 2.)

(18) The commercial insurance application identifies the nature of the business to be operated as including providing medication, monitoring and distribution services for its personal care residents. (Plaintiff's exhibit no. 8.)

(19) The total premiums for the three insurance policies covered by the commercial premium finance agreement totaled $11,333, with an initial payment of $3,133, leaving an amount of $8,200 to be financed, payable in nine monthly installments of $953.85. (Plaintiff's exhibit no. 11, p. 1.)

(20) According to the commercial premium finance agreement, the first installment was due July 26, 1992. (Plaintiff's exhibit no. 11, p. 1.)

(21) According to the testimony of Carolyn Perkowski, Imperial's employee, the first installment was due August 11, 1992.

(22) Whatever the actual due date of the first installment, the payment was not made in a timely fashion by either of the borrowers on the commercial premium finance agreement.

(23) Geffers testified that he was informed by an employee of RBL that the initial installment was not timely paid under Imperial's commercial premium finance agreement.

(24) Geffers contacted Bruno, either by phone or in person, and discussed the delinquency.

(25) Subsequently, Bruno hand-delivered to RBL a check dated August 26, 1992, made payable to Imperial Finance in the amount of $1,001.54. (Plaintiff's exhibit no. 5.)

(26) The August 26, 1992 check was forwarded to Imperial.

(27) Neither Bruno nor Shyam Mahajan ever received a notice of intent to cancel in August of 1992 from Imperial.

(28) The second installment due under the commercial premium finance agreement in September of 1992 was also not timely paid.

(29) Imperial sent a notice of intent to cancel dated September 11, 1992 to one of the insureds, Peoples Personal Care Medical & Rehabilitation Center, and to RBL of Pennsylvania. (Plaintiff's exhibit no. 9, p. 18.)

(30) The only proof of Imperial's mailing of the September 11, 1992 notice of intent to cancel is an unnotarized, general written statement from a California Imperial employee that he took the envelope with a notice of intent to cancel in it to a private presort service company, and the presort service company was then sup-

posed to have taken the envelope to the United States Post Office for mailing. (Plaintiff's exhibit no. 9, p. 19.)

(31) Imperial sent the identical September 11, 1992 notice of intent to cancel to the insured, Peoples and RBL. However, the notice of intent to cancel, located in Imperial's business records, is not the same as the document located in the business records of RBL. (Comparing plaintiff's exhibit no. 9, p. 19 to Geffers' exhibit no. 1.)

(32) Bruno and Shyam Mahajan testified they did not receive a notice of intent to cancel.

(33) Imperial sent a notice of intent to cancel, addressed to "Peoples Personal Care Medical & Rehabilitation Center and" at 51 N. Second Street, Stroudsburg, PA 18601, but did not send a notice of intent to cancel to the other borrower under its premium finance agreement or the other insureds identified in Scottsdale's policies.

(34) Imperial also sent a notice of cancellation dated September 28, 1992 to the insured, Peoples Personal Care Medical & Rehabilitation Center, as well as to RBL. (Plaintiff's exhibit no. 9, p. 20.)

(35) As with the notice of intent to cancel, Imperial's only proof of mailing is an unnotarized and generic written statement by the same California employee that he took an envelope with a notice of cancellation to the private presort service company, which was to have subsequently taken the envelope to the United States Post Office for mailing. (Plaintiff's exhibit no. 9, p. 21.)

(36) No evidence was presented at trial which would show a chain of custody between the delivery of the envelopes (containing the notices of intent to cancel and cancellation), to the presort service company and the actual mailing of the envelopes by placing them in the United States mail.

(37) As with the notice of intent to cancel, the September 28, 1992 notices of cancellation addressed to Peoples and to RBL were not identical documents, contrary to the testimony of Imperial. (Comparing plaintiff's exhibit no. 9, p. 20 to Geffers' exhibit no. 9.)

(38) Imperial sent written notice of cancellation to the insurer, Scottsdale, by separate notices dated September 28, 1992. (Plaintiff's exhibit no. 9, p. 23.)

(39) The one notice of cancellation addressed to Scottsdale misidentified Scottsdale's general liability policy information as being the automobile policy provided by Travelers Insurance Company, TCMB 201T14. (Plaintiff's exhibit no. 9, p. 23.)

(40) According to the cancellation provisions set forth in Scottsdale's GLS and UMB policies, in order for Scottsdale to properly cancel coverage for its insureds, Scottsdale is required to provide advanced written notice of both its intent to cancel and actual cancellation.

(41) Scottsdale presented no testimony at trial regarding any notices it may have sent to Chaitanya, the medical director, or to the other two insureds (Peoples and No Problem) regarding cancellation in compliance with the insurance policy provisions.

(42) The alleged date of cancellation by Imperial was a Sunday.

(43) Peoples began receiving residents in the personal care home in July of 1992.

(44) The defendant, June Grim, was admitted to Peoples on August 20, 1992. (Plaintiff's exhibit no. 10.)

(45) Scottsdale's GLS and UMB policies were in effect between August 20, 1992 and September 26, 1992.

(46) Dr. Mahajan was the medical director for Peoples from August 20, 1992 through November 1992. (Plaintiff's exhibit no. 7.)

(47) Pursuant to the provisions of the GLS and UMB policies, coverage is triggered if bodily or personal injury occurs during the policy period, owing to continuous or repeated exposure to conditions. (Plaintiff's exhibits no. 2 & no. 3.)

(48) On November 29, 1992, June Grim suffered a massive stroke.

(49) On October 28, 1994, June Grim filed a complaint docketed to no. 2075 Civil 1994, seeking compensation for the injuries she alleges she suffered due to the negligent treatment and care provided by the various defendants associated with Peoples and Fay's Drugstore. (Plaintiff's exhibit no. 10.)

(50) The June Grim complaint, in addition to making claims of medical malpractice against Doctors Mahajan, Taylor and Gupta, also makes nonmedical malpractice claims for liability against No Problem, Peoples, Louis

Bruno, Joan Frey a/k/a Joan Frey Bruno and Dr. Mahajan in his capacity as the medical director.

(51) On February 9, 1995, Scottsdale filed a complaint for declaratory judgment, docketed to no. 360 Civil 1995, requesting the court to define and designate the scope and extent of the coverage under three insurance policies for its various insureds.

(52) Partial summary judgment was granted on April 26, 1996 by this court, finding that Scottsdale was under no duty to indemnify or defend any of the defendants pursuant to a third policy, no. CLS 067641.

(53) A non-jury trial was held on September 30, 1999 and October 1, 1999 before this court to determine the status of the remaining two policies.

## DISCUSSION

Scottsdale Insurance Company has the burden of proof to establish that both of its insurance policies, GLS 466888 and UMB 025971, were cancelled effective September 27, 1992 as to all of the insureds in compliance with the provisions of the Insurance Premium Finance Company Act, 40 P.S. §3301 et seq. Section 3310 of the Act outlines the cancellation provisions to be followed when an insurance premium finance company is involved in securing insurance coverage.

Section 3310 provides as follows:

"Section 3310. Cancellation of insurance contract upon default

"(a) *Procedure.* When an insurance premium finance agreement contains a power of attorney enabling the insurance premium finance company to cancel any insurance contract or contracts listed in the agreement, the insurance contract or contracts shall not be canceled by the premium finance company unless the cancellation is effectuated in accordance with this section.

"(b) *Written notice.* Not less than 15 days' written notice shall be mailed to the insured, at his last known address as shown on the records of the insurance premium finance company, of the intent of the insurance premium finance company to cancel the insurance contract or contracts unless the default is cured within such 15-day period.

"(c) *Curing default.* In the event that after giving the prescribed notice, the default is not cured within the 15-day period, the insurance premium finance company may cancel the insurance contract or contracts by mailing a notice of cancellation to the insurer. The insurance contract shall be canceled as if the notice of cancellation had been submitted by the insured himself but without requiring the return of the insurance contract. The insurance premium finance company shall also mail a notice of cancellation to the insured at his last known address as shown on the records of the insurance premium finance company.

"(d) *Statutory, regulatory and contractual restrictions.* All statutory, regulatory and contractual restrictions providing that the insurance contract may not be canceled

unless notice is given to a governmental agency, mortgagee or other third party shall apply where cancellation is effected under the provisions of this section. The insurer shall determine the effective date of cancellation taking into consideration the number of days' notice required to complete the cancellation. The insurer shall not be required to send the insured any notice of cancellation when the insurance policy is canceled by an insurance premium finance company pursuant to the terms of this section."

The crux of this case is whether Imperial properly followed the statutory requirements when they mailed the notices of cancellation.

An employee of Imperial from its New Jersey office testified as the custodian of the records for Imperial about these two insurance policies. The records, mailed to her from Imperial's California home office, evidenced that notices of cancellation were delivered to a private presort company under contract to Imperial. Scottsdale argues this is sufficient to satisfy the "mailbox" rule.

The mailbox rule recognized in Pennsylvania stands for the proposition that proof that a letter was properly mailed raises a rebuttable presumption that the letter was received. *Donegal Mutual Insurance Co. v. Insurance Department,* 719 A.2d 825 (Pa. Commw. 1998). Unfortunately, the mailbox rule does not apply to the facts of this case because Scottsdale, through the Imperial witness, failed to present evidence that the envelopes containing the notice of intent to cancel or the notice of can-

cellation were actually mailed by the United States Postal Service. *PennDOT v. Brayman Construction Corp.- Bracken Construction Co.,* 99 Pa. Commw. 373, 513 A.2d 562 (1986). Even if the mailbox rule applied, Scottsdale failed to show Imperial's compliance with subsection 3310(b)'s mail requirement because Imperial delivered the letters of intent to cancel and cancellation at a private presort company and not directly to the United States Post Office. See *Lin v. Unemployment Compensation Board of Review,* Pa. Law Weekly, Sept. 6, 1999 (Pa. Aug. 17, 1999) (holding only U.S. postmark is reliable enough to prove that a document has been mailed on time).

Plaintiff has also failed to show Imperial's compliance with subsection 3310(c) which requires Imperial to send written notice to Scottsdale of Imperial's cancellation of the two policies, effective September 27, 1992. The Imperial September 28, 1992 notice of cancellation sent to Scottsdale incorrectly named the Travelers Insurance Company policy information regarding automobile insurance, as opposed to the proper GLS policy information pertaining to Scottsdale's policy. Chaitanya Associates, along with the medical director, are third parties under the terms of subsection 3310(d), which requires the contractual provisions of insurance contracts to be followed when a third party is affected by cancellation of insurance completed under the provisions of the Insurance Premium Finance Company Act.

Since Chaitanya and the medical director are additional insureds identified on both the GLS and UMB policies,

in order for coverage to be canceled, Scottsdale would have had to comply with the cancellation provisions contained in its own insurance contracts. Scottsdale presented no evidence that it complied with the cancellation provisions under its two insurance policies with regard to Chaitanya Associates, the medical director or the other two insureds. It is incumbent upon an insurance company to comply strictly with the conditions of cancellation and to give the prescribed notice. *Schock v. Penn Township Mutual First Insurance Association of Lancaster County,* 150 Pa. Super. 77, 24 A.2d 741 (1942). When notice of cancellation is required by statute or policy, an insurer's failure to follow such requirement results in the continuation of coverage. *Royal Indemnity Company v. Adams,* 309 Pa. Super. 233, 455 A.2d 135 (1983).

## CONCLUSIONS OF LAW

(1) Imperial Premium Finance Inc. did not comply with the Insurance Premium Finance Company Act, 40 P.S. §3301 et seq.

(2) Both Scottsdale policies were not effectively canceled and were in effect between August 20, 1992 and September 26, 1992.

(3) Scottsdale has a duty to defend and indemnify the insureds under its GLS and UMB policies.

## ORDER

And now, November 8, 1999, plaintiff's motion for declaratory judgment is denied.