Glenda **UNGER**, Plaintiff,

v.

**AFCO CREDIT CORP.,**
**et al., Defendants.**

**Civil Action No. 00–6303 (MLC).**

United States District Court,
D. New Jersey.

Sept. 30, 2002.

Harrington & Caldwell, P.C. (Sally J. Caldwell of counsel), Cherry Hill, NJ, for Plaintiff.

Budd, Larner, Gross, Rosenbaum, Greenberg & Sade, P.C. (Susanna J. Morris of counsel), Cherry Hill, NJ, for defendant Scottsdale Insurance Company.

White & Williams, LLP (Christopher P. Leise of counsel), Westmont, NJ, for defendant USI Midlantic, Inc.

## MEMORANDUM OPINION

COOPER, District Judge.

This is an action, *inter alia,* to recover damages for breach of an insurance policy. The insurer, the defendant Scottsdale In-

surance Company ("Scottsdale"), moves for summary judgment dismissing the complaint and all cross claims insofar as asserted against it. For the following reasons, the motion is denied.

## BACKGROUND: THE PARTIES; THE PREMIUM FINANCE AGREEMENT; INTENT TO CANCEL AND CANCELLATION; and, MOTION PRACTICE

### I. The Parties

The plaintiff, Glenda Unger ("Unger"), is a resident of New Jersey and allegedly held an insurable interest in a commercial building in Lakewood, New Jersey ("the Lakewood property"). (Am. Compl. at 2; Unger Cert. dated 1–28–02 ("1–28–02 Cert.") at 1–2.) Since 1986, she had an office near the Lakewood property to oversee her real estate holdings, run a taxicab company, sell cars, and receive mail. (Cert. in Supp. of Pl.'s Resp. filed 2–8–02 ("Pl.'s 2–8–02 Cert."), Ex. A, Tr. of Unger's 8–2–01 Dep. ("Unger Dep.") at 11, 14, 20–24.) Scottsdale, an Arizonan insurer, issued policy number CPS0322732 ("the policy") to Unger in July 1999 covering, *inter alia*, fire damage to the Lakewood property from July 23, 1999, through July 23, 2000. (Scottsdale's Br. in Supp. of Mot. for Summ. J. ("Scottsdale Br."), Ex. C.) In a July 22, 1999, premium finance agreement ("the agreement"), Unger contracted with the defendant Afco Credit Corp. ("Afco"), a Pennsylvanian premium finance company, to finance her one-time premium payment to Scottsdale and agreed to repay Afco on a monthly basis. (*Id.*, Ex. B.) The defendant USI Midlantic, Inc. ("USI") was Unger's insurance agent as she procured coverage and premium financing. (Am. Compl. at 5–6.) [1]

### II. The Premium Finance Agreement

The agreement included: (1) a limited-power-of-attorney provision appointing Afco as Unger's attorney-in-fact with authority to direct Scottsdale to cancel the policy—upon giving *any required statutory notice*—if she missed a payment, and permitting Afco to execute and deliver on her behalf all forms, instruments, and notices concerning the policy in furtherance of the agreement; and (2) a provision that New Jersey law governed. (Scottsdale Br., Ex B. at ¶¶ 2, 14, 23.) Thus, the manner in which Afco could direct Scottsdale to cancel the policy was to be in accordance with the New Jersey Insurance Premium Finance Company Act ("the Act"). *See* N.J.S.A. §§ 17:16D–1, 17:16D–13(a).

Afco was required under the Act to give Unger at least ten days written notice by mail of its intent to direct Scottsdale to cancel the policy if she missed a payment, unless she cured her default; Afco was also required to "send" a copy of the notice of intent to cancel to USI. N.J.S.A. § 17:16D–13(b). Afco could then request cancellation of the policy in Unger's name after the ten-day period expired by mailing to Scottsdale a notice of cancellation; the policy would then be cancelled as if the notice had been submitted by Unger herself. N.J.S.A. § 17:16D–13(c). Afco was also required to mail a notice of cancellation to Unger's last known address and to USI. *Id.*

### III. Intent to Cancel and Cancellation

Afco allegedly mailed Unger a notice of intent to cancel the policy from its Kansas office on September 1, 1999, but—according to the eventual deposition testimony of

---

**1.** USI is also listed as USI Colburn Insurance Service, a/k/a USI Insurance Services Corporation, f/k/a Colburn Insurance Service, a/k/a Colburn–Bertholon–Rowland Insurance. (Am.Compl.)

Martin Quish ("Quish"), an Afco employee working in its New York office since 1998—it failed to keep a copy. (Pl.'s 2–8–02 Cert., Ex. C, Tr. of Quish's 8–28–01 Dep. ("Quish Dep.") at 5, 13.) Afco generated a print-out in Kansas dated September 1, 1999, entitled, "List of 'Notice of Intent to Cancel'" ("the print-out"), listing several insureds, agents, and account numbers; Unger and a USI employee were included. (Scottsdale Br., Ex. G.) The print-out included no addresses and contained at the bottom the following: "I certify that notices of intent to cancel ... containing information shown above were placed in envelopes with the postage fully prepaid, sealed and deposited in the mail addressed to the insured and insurance agent at the proper addresses on the date shown above." (*Id.*) That statement was signed and dated by Ann James, an Afco employee in Kansas. (*Id.;* Quish Dep. at 11, 78.)

It was James's job—according to Quish—to review the notices, put them in envelopes, and bring them to the mail room. (*Id.* at 13, 81–84.) The mail-room employees, however, neither signed affidavits attesting that these notices were mailed, nor did they obtain proof of receipt from the post office. (*Id.* at 24–25, 84–85.) Quish also testified that he knew neither who ran the mail room nor who was in charge of affixing postage to the mail in Kansas. (*Id.* at 94–95.)

Unger testified at her eventual deposition that neither she nor her family-member employees received the notice of intent. (Unger Dep. at 36–38, 58.) Her sister, a former employee, agreed with this testimony at her deposition and testified that she had always referred any notices of intent to cancel policies to Unger. (Pl.'s 2–8–02 Cert., Ex. D, Tr. of Ellen Goldberg's 8–28–01 Dep. ("Goldberg Dep.") at 31–33.)

Afco allegedly mailed notices of cancellation of the policy to Unger and Scottsdale from Kansas on October 8, 1999; the cancellation was to be effective six days later. (Scottsdale's Br., Ex. J., Notice of Cancellation; Quish Dep. at 62–63, 78–79.) Afco apparently kept a copy of the notice of cancellation allegedly mailed to Unger. (*Id.*) But Afco failed to keep a copy of the original notice of cancellation allegedly mailed to Scottsdale. (*Id.* at 66). Also, according to Scottsdale itself, Scottsdale "did not receive a copy of the Notice of Cancellation mailed on October 8, 1999, until April 3, 2000, when it was faxed to Scottsdale's broker." (Pl.'s 2–8–02 Cert., Ex. F, Scottsdale's Resp. to Pl.'s Req. to Admit dated 10–29–01 ("Scottsdale's Resp. to Req. to Admit").) As to a list showing Unger's notice of cancellation, Quish testified as follows:

COUNSEL: [W]hen a notice of cancellation goes out, is a form generated like the notice of intent?

QUISH: We have a listing. There is a listing, a notice of cancellation listing for that day.

COUNSEL: ... I want to know if there's such a document for the notice of cancellation that allegedly went to Ms. Unger.

QUISH: Yes, there is.

COUNSEL: That is something that you can produce? ...

QUISH: If we still have it, yes, it is.

COUNSEL: If you still have it, where could it be if you don't still have it?

QUISH: We have retention dates. It might be destroyed by now. I don't know—for that exact form that you're speaking about, I don't know what the actual retention date is....

COUNSEL: That is Ann James's job also at this time period?

QUISH: No, it is not.

COUNSEL: It's someone else's job?

QUISH: Yes, it is.

COUNSEL: And who's job is that?

QUISH: I do not know.

*Id.* at 86–87. Apparently, Afco also had no "certification" that the notice of cancellation was mailed to Unger.

Unger testified in her deposition that neither she nor her family-member employees received a notice of cancellation from Afco. (Unger Dep. at 44–46, 58.) Her sister testified to this as well. (Goldberg Dep. at 32–33).

The Lakewood property was damaged by fire on July 12, 2000. (Am. Compl. at 2; Scottsdale Br. at 5.) Scottsdale denied coverage in September 2000, asserting that the policy had been "cancelled by [Afco] effective 10–14–99 for non-payment of premium." (Pl.'s 2–8–02 Cert., Ex. M, letter dated 9–5–00.) Unger commenced this action in December 2000.

## IV. *Motion Practice*

This Court granted Afco's earlier motion to dismiss the complaint insofar as asserted against it (*see* Fed.R.Civ.P. 12(b)(6)) by order dated December 21, 2001 ("12–21–01 Order"). Without considering whether Afco provided proper notices of intent to cancel or of cancellation, the Court held that Unger had no legally cognizable cause of action against Afco, even though Afco was charged with complying with the Act's notice requirements. (*Id.* at 10.) The Court found that under New Jersey law the Act's purpose is promoted "by treating [Afco's] failure ... to follow [the Act] as vitiating any purported cancellation of the insurance policy, thereby allowing [Unger] to pursue a cause of action against [Scottsdale]." (*Id.* at 18.) In addition, the Court held that under New Jersey law "an insured is best protected from an unannounced cancellation

by permitting the insured to sue the insurer under the insurance policy rather than by recognizing the cancellation but permitting a claim against a premium finance company," and that Scottsdale had the burden of showing Afco's compliance. (*Id.* at 22–25.) The Court also found that New Jersey public policy dictated that premium finance companies be protected from liability that might otherwise cause them to cease financing premiums for those who could not otherwise afford to buy insurance. (*Id.*)

Scottsdale now moves for summary judgment dismissing the complaint and all cross claims insofar as asserted against it, arguing that the policy was properly cancelled. Alternatively, it argues that Unger did not have an insurable interest in the Lakewood property and, thus, is not entitled to coverage.

## DISCUSSION: SUMMARY JUDGMENT STANDARD; AFCO'S ALLEGED CANCELLATION; and, UNGER'S INSURABLE INTEREST

### I. *Summary Judgment Standard*

A court may grant a motion for summary judgment

if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). The summary judgment movant bears the initial burden of showing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the movant has met that initial burden, the non-movant must present evidence establishing that a genuine issue of material fact exists, making it necessary to resolve the difference at trial.

*Id.* at 324, 106 S.Ct. 2548; *Jersey Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103, 1109 (3d Cir.1985). The non-movant, rather then rely on mere allegations, must present actual evidence that raises a genuine issue of material fact. *Anderson v. Liberty Lobby*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The Court must view the evidence in the light most favorable to the non-movant when deciding a summary judgment motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The judge's role at the summary judgment stage is not to weigh the evidence, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247–48, 106 S.Ct. 2505 (emphasis in original). A fact is material only if it might affect the outcome of the action under governing law. *Id.* at 248, 106 S.Ct. 2505; *Boyd v. Ford Motor Co.*, 948 F.2d 283, 285 (6th Cir.1991). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted).

## II. *Afco's Alleged Cancellation*

■ Afco was required, *inter alia*, to mail notice to Unger of its intent to direct Scottsdale to cancel the policy and then mail notices of cancellation to Scottsdale and Unger. N.J.S.A. § 17:16D–13; *Wright v. Rumble*, 194 N.J.Super. 337, 476 A.2d 1250 (App.Div.1984). Section 17:16D–13 "require[s] exact and careful compliance and [is] to be strictly enforced. This is no more than a matter of attention to the public policy of New Jersey and a matter of general public importance." *Brown v. Shaw*, 174 N.J.Super. 32, 40, 415 A.2d 360, 364 (App.Div.1980). Scottsdale, as the insurer and summary judgment movant, bears the initial burden of showing that there is no genuine issue of material fact as to whether Afco complied with the statutory notice requirements. *See Ryan v. Henderson*, 220 N.J.Super. 589, 533 A.2d 70 (Super. Ct. Monmouth Cty. 1986); *see generally Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. It has failed to do so.

■ The parties cite, and the Court's research reveals, no regulations regarding records a premium finance company must maintain under N.J.S.A. § 17:16D–13. However, this Court concludes that the New Jersey courts would likely deny an insurer's summary judgment motion unless it was supported by (1) either testimony or affidavits from the employees or agents of the premium finance company with actual knowledge of the content, addressees, and mailing of the notices of intent to cancel and of cancellation, and (2) certified office copies from the premium finance company of those notices. *See Kende Leasing Corp. v. A.I. Credit Corp.*, 217 N.J.Super. 101, 106, 524 A.2d 1306, 1308–09 (App.Div.1987); *see also Needham v. N.J. Ins. Underwriting Ass'n*, 230 N.J.Super. 358, 371, 553 A.2d 821, 828 (App.Div.1989) (involving insurer's direct relationship with insured).[2] This Court also concludes that the New Jersey courts

---

2. *See also Lopez v. N.J. Auto. Full Ins. Underwriting Ass'n*, 239 N.J.Super. 13, 24, 570 A.2d 994, 999 (App.Div.1990) (stating certification on mailing of renewal not based on personal knowledge insufficient as matter of law).

would likely accept a business record custodian's testimony as to the accuracy of any affidavits only if the proper employees or agents of the premium finance company executed them at the time of the actual preparation, addressing, and mailing of the notices. *See Celino v. Gen. Accident Ins.*, 211 N.J.Super. 538, 543, 512 A.2d 496, 499 (App.Div.1986).

These requirements are neither unusual nor unreasonable. In *Scottsdale Insurance Co. v. Grim*, 44 Pa. D. & C.4th 338 (Ct. Com. Pl. Monroe Cty.1999), the insurer sought a judgment declaring that it need not defend and indemnify the insured because the policy had been cancelled at a premium finance company's direction. The *Grim* court denied the relief, as the insurer failed to show that the finance company complied with the Pennsylvania Insurance Premium Finance Company Act; its notice requirements are similar to those in N.J.S.A. § 17:16D–13. *See* 40 P.S. § 3310. The court found that a finance company employee's unnotarized, general written statements that the notices were brought to a presort service were insufficient to demonstrate that they were actually mailed by the post office. *Grim*, 44 Pa. D. & C.4th at 350–51.

The New York intermediate appellate courts addressing compliance with similar notice requirements under the New York Insurance Premium Finance Agencies Act are also in accord with New Jersey. *See* N.Y. Banking Law § 576; *L.Z.R. Raphaely Galleries v. Lumbermens Mut. Cas. Co.*, 191 A.D.2d 680, 681–82, 595 N.Y.S.2d 802, 804 (2d Dep't 1993) (finding insurer failed to show agency complied with notice requirement; submitted no affidavit of agency employee at mailing location attesting first-hand to methods used to ensure proper mailing); *Lumbermens Mut. Cas. Co. v. Comparato*, 151 A.D.2d 265, 267–68, 542 N.Y.S.2d 179, 181–82 (1st Dep't 1989)

(finding agency's cancellation list included no addresses and, thus, no showing that addresses on envelopes were checked; no testimony or affidavit from agency employee who allegedly mailed notices); *Friedman v. Allcity Ins. Co.*, 118 A.D.2d 517, 518–19, 500 N.Y.S.2d 124, 125 (1st Dep't 1986) (finding affidavit of agency's employee, who had no personal knowledge and stated computer-generated log showed notices were sent, insufficient).

■ Scottsdale has failed to submit testimony or an affidavit from an Afco employee with actual knowledge of the mailing of Unger's notice of intent to cancel and of the notices of cancellation for Unger and Scottsdale. *See Kende*, 217 N.J.Super. at 106, 524 A.2d at 1308–09; *Needham*, 230 N.J.Super. at 371, 553 A.2d at 828. It submitted a print-out of the allegedly mailed notices of intent to cancel, listing no addresses and containing a "certification" of an Afco employee in Kansas that the notices listed thereon—one of which was for Unger—were properly mailed. (Scottsdale Br., Ex. G.) But a different employee in the mail room actually deposited them in the mail. (Quish Dep. at 24–25, 84–85.) Scottsdale submitted neither testimony nor an affidavit from this mail-room employee. In fact, Afco's witness—Quish—knew neither who ran the Kansas mail room nor who was in charge of affixing postage. (*Id.* at 94–95.) Furthermore, Quish could only testify that it was James's job to review notices of intent, put them in envelopes, and bring them to the mail room, not that she actually did so here. (*Id.* at 13, 81–84.) Quish did not know who was responsible for the production and mailing of the notices of cancellation, and he testified that the list detailing the mailing of Unger's notice of cancellation may have been destroyed. (*Id.* at 85–87.)

Scottsdale has also failed to submit copies, whether certified or in any other form, of the notice of intent Afco allegedly mailed to Unger in September 1999 and the notice of cancellation allegedly sent to it in October 1999 (*see Kende*, 217 N.J.Super. at 106, 524 A.2d at 1308–09; *Needham*, 230 N.J.Super. at 371, 553 A.2d at 828) because Afco failed to maintain them. (Quish Dep. at 5, 13, 66.) Thus, because of the deficiencies in Scottsdale's submissions, the branch of its motion which is for summary judgment dismissing the complaint and all cross claims insofar as asserted against it on the ground that the policy was properly cancelled is denied.

■ The parties have not cited a New Jersey Supreme Court case on compliance with N.J.S.A. § 17:16D–13. The intermediate New Jersey appellate-court decisions cited herein are not necessarily binding. *Gares v. Willingboro Twp.*, 90 F.3d 720, 725 (3d Cir.1996). But such decisions are "not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *West v. Am. Telephone & Tel. Co.*, 311 U.S. 223, 237, 61 S.Ct. 179, 85 L.Ed. 139 (1940); *see Boyanowski v. Capital Area Intermediate Unit*, 215 F.3d 396, 406 (3d Cir.), *cert. denied*, 531 U.S. 1011, 121 S.Ct. 566, 148 L.Ed.2d 485 (2000). The Court has found no persuasive data that the New Jersey Supreme Court would decide this branch of Scottsdale's motion differently.

The Court need not address Unger's arguments in opposition to the motion as to her non-receipt of the notices. *See Needham*, 230 N.J.Super. at 371–72, 553 A.2d at 829; *see also Auger v. Gionti Agency*, 218 N.J.Super. 360, 364, 527 A.2d 928, 930 (App.Div.1987) (noting insured admitted receiving notice); *see generally Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. As Scottsdale has not met its initial burden,

the Court need not determine, for instance, whether Unger's testimony was merely self-serving. Credibility determinations, and the weighing of her testimony against Scottsdale's evidence, must be performed by a trier of fact.

### III. Unger's Insurable Interest

■ Unger claimed to own the Lakewood property in her pleadings and testimony. (Am. Compl. at 1; Unger Dep. at 15, 26.) But in support of its motion, Scottsdale submitted deeds showing that the property was transferred from Standard Roofings, Inc. ("Standard") to 100 Ocean Avenue LLC ("Avenue LLC") in September 1999, and then to Red Oak LLC ("Red Oak") in June 2000. (Scottsdale Br., Exs. M & N.) In addition, USI has submitted Unger's 1999 and 2000 tax returns, which do not list the property as part of her holdings. (USI's R. 56.1 Stmt., Exs. G & H.) Thus, Scottsdale has met its initial burden in support of its argument that Unger had no insurable interest in the Lakewood property when the policy was issued in July 1999 and the fire occurred in July 2000. *See Celotex*, 477 U.S. at 323, 106 S.Ct. 2548.

Unger has submitted in opposition a July 1999 agreement with Standard, wherein she is listed as the Lakewood property's buyer. (1–28–02 Cert., Ex. 1 ("the 7–19–99 agreement").) In the 7–19–99 agreement, she agreed to pay Standard $25,000, was given access to and use of the property, was required to buy insurance and maintain the property, and was required to pay off certain liens. (*Id.*) The 7–19–99 agreement anticipates a sale to Unger, and states, "Until such time as [Unger] makes payment to [Standard] in the amount of $25,000, [Unger] will pay [Standard] $500 per month to occupy the premises." (*Id.*)

Unger also submitted agreements with Avenue LLC, dated September 27, 1999, and Red Oak, dated June 5, 2000, wherein she agreed to lease and maintain the Lakewood property, and to buy fire insurance. (1–28–02 Cert., Exs. 3 & 4.) The agreements also gave her an option to buy the property. (*Id.*) She has also submitted two leases dated December 15, 1999, wherein she subleased space on the property to others. (Pl.'s 2–8–02 Cert., Ex. O.) The evidence submitted by Unger of her alleged payments, obligations to buy insurance and maintain the property, options to buy, and subleases establish that a genuine issue of material fact exists on her insurable interest in the Lakewood property.

 Unger "retains an insurable interest as long as [she] has a reasonable expectation of deriving pecuniary benefit from the preservation of the property or would suffer a direct pecuniary loss from its destruction." *Miller v. N.J. Ins. Underwriting Ass'n*, 82 N.J. 594, 600, 414 A.2d 1322, 1325 (1980). Thus:

> The test of insurable interest in property is whether the insured has such a right, title or interest therein, *or relation thereto*, that [she] will be benefitted by its preservation and continued existence or suffer a direct pecuniary loss from its destruction or injury by the peril insured against.

*Lancellotti v. Md. Cas. Co.*, 260 N.J.Super. 579, 584, 617 A.2d 296, 298 (App.Div.1992) (emphasis in original) (citation omitted). Viewing the evidence in the light most favorable to Unger, *see Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348, there exists a genuine issue of material fact on her insurable interest in the Lakewood property. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. *See also Special Jet Servs. v. Fed. Ins. Co.*,

643 F.2d 977, 982 (3d Cir.1981) (finding lessee had insurable interest in airplane, as exposed to risk of suit for injuries or damages caused by airplane). The branch of Scottsdale's motion which is for summary judgment dismissing the complaint and all cross claims insofar as asserted against it on the ground that Unger held no insurable interest in the Lakewood property is denied.[3]

An appropriate order accompanies this memorandum opinion.

---

**3.** Unger is advised to clarify the extent of her alleged insurable interest in future court filings.